Filed 7/29/26  P. v. Grado CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN DANIEL GRADO,<br><br>    Defendant and Appellant. | F088999<br><br>(Super. Ct. No. F19905558)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench, Jessica A. Eros, and Rosanne Rust, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Juan Daniel Grado fired a shotgun at a closed door, killing a man who was standing behind it.  He was convicted of second degree murder based on a theory of implied malice.  On appeal, defendant alleges multiple jury instruction errors, including failure to instruct on the lesser crime of involuntary manslaughter.  Defendant also challenges the admissibility of his custodial statements based on coercive interrogation tactics.  We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying incident occurred in 2019, when defendant was 18 years old.  He was charged with one count of murder (Pen. Code, § 187, subd. (a)).[1]  A firearm enhancement allegation was pleaded pursuant to section 12022.53, subdivision (d).  Defendant was further alleged to have suffered a juvenile adjudication for robbery (§ 211) that qualified as a prior strike conviction under the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12).  With exception of the strike allegation, which defendant ultimately admitted, the charges were tried before a jury in 2024.

**Prosecution Case**[2]

In August 2019, victim Ricky Lee Brogdon had recently separated from his wife and was living in a house with two adolescent sons from a prior relationship.  Brogdon also had two younger children, both from his current marriage, but they were not in the house on the night in question.  The younger children were reportedly living with his wife.

Brogdon's separation from his wife generally coincided with the end of his friendship with defendant.  According to Brogdon's eldest son, defendant and his father

---

[1]     Undesignated statutory references are to the Penal Code.  Two additional misdemeanor counts were dismissed at the People's request on the first day of trial.

[2]     Part of this summary is based on crime scene photographs admitted into evidence at trial.  The following material was transmitted from the trial court to this court at our request:  People's Exhibits Nos. 2 through 80, 82 through 90, and 95 through 99.  (See Cal. Rules of Court, rules 8.224(d), 8.320(e).)

were once "really good friends." Defendant was a frequent guest in their home, visiting on at least a weekly basis. Things changed after defendant began having a romantic relationship with Brogdon's wife. It is unclear from the record whether the relationship started before or after the marital separation.

Data extracted from Brogdon's cell phone helped to establish a timeline of the events leading up to his death. On August 15, 2019, at 2:18 a.m., Brogdon received a phone call from defendant that lasted 43 seconds. At 2:20 a.m., Brogdon placed a call to his wife. They spoke for two minutes, and Brogdon called her again at 2:31 a.m. The second conversation lasted about 90 seconds.[3]

A security camera at a nearby residence captured video of a car entering Brogdon's neighborhood at 2:43 a.m. One minute later, at 2:44 a.m., Brogdon received a phone call from defendant that lasted 22 seconds. Defendant appeared in an alleyway behind Brogdon's home either shortly before or shortly after the call. Brogdon placed another call to his wife at 2:47 a.m. As soon as that call ended, Brogdon called 911.

Brogdon's eldest son testified to awakening from sleep, leaving his bedroom, and seeing his father pacing back and forth while talking on the phone. His father subsequently exited the house through a door in their laundry room, which was adjacent to the kitchen and led to the backyard. The son followed Brogdon outside and witnessed an argument between defendant and his father. Defendant was standing behind a chain-link fence/gate at the edge of the property, about 80 feet away from the laundry room door.

Brogdon eventually went back inside the house and locked the door. He told his son to go into his bedroom. A few minutes later, both of Brogdon's sons heard a loud

---

[3] Brogdon's outgoing calls were to a number ending in 9504, which was saved in his phone under the name "Babies Mom." Defendant later called the same number from jail, and the People's evidence showed that the person who answered was Brogdon's wife. The prosecutor thus alleged, without dispute, that all calls to the 9504 number were to Brogdon's wife.

noise. They investigated and saw Brogdon on the laundry room floor, surrounded by blood. Brogdon's younger son noticed a knife near his father's hand, which was a detail confirmed by crime scene investigators. Brogdon was believed to have armed himself with a kitchen knife after arguing with defendant in the backyard.

Brogdon's phone records show that he called 911 at 2:49 a.m. At approximately 2:56 a.m., the Fresno Police Department's gunshot detection system, ShotSpotter, indicated possible gunfire at Brogdon's address. Several officers responded to the ShotSpotter notification and a separate 911 call from a neighbor.

It was undisputed that defendant shot and killed Brogdon with a single blast from a 20-gauge shotgun. An autopsy confirmed the cause of death was a shotgun wound to the head. The coroner found multiple birdshot pellets inside Brogdon's skull.

Crime scene photos and other evidence indicated that defendant and Brogdon were standing on opposite sides of the laundry room door when the shot was fired. Defendant placed the muzzle of the shotgun against, or very close to, a thin metal screen on an exterior security door. The gunshot blew a hole through the screen and the door behind it, which the photos show was made of fiberglass or a similar composite material.

As discussed in police testimony and shown in various photographs, a large pool of blood formed in front of the laundry room door after Brogdon fell to the ground. His blood-drenched cell phone was discovered in the same spot. According to the coroner's testimony, a curved laceration near Brogdon's left ear was likely caused by the "wadding" of the shotgun ammunition. Wadding injuries generally indicate close proximity to the muzzle of the shotgun.

Within 30 minutes of the shooting, defendant was stopped by the California Highway Patrol (CHP) and detained on suspicion of driving while intoxicated. His blood alcohol content (BAC) was 0.17 percent as measured by a breath test administered during the stop. A 20-gauge shotgun was seized from the back seat of the vehicle. Subsequent forensic testing showed the presence of defendant's DNA and palm prints on the shotgun.

CHP officers arrested defendant and his passenger, Anthony Amezcua. Amezcua submitted to police questioning and revealed that he and defendant had visited defendant's "girlfriend" at a "hotel" approximately 30 minutes prior to the shooting. The evidence strongly implied that the referenced "girlfriend" was Brogdon's wife. It was undisputed that Brogdon's wife was living in hotels or motels at the time.

After leaving the hotel, defendant drove himself and Amezcua to Brogdon's neighborhood. After parking in the alleyway, defendant said to Amezcua, "I'm going to kill this [guy]. I'm going to kill him. He fucked my baby mom." Amezcua asked who he was talking about, and defendant replied, "Rick."

Amezcua and defendant walked to the back of Brogdon's property. Brogdon came out of the house and basically told them that "he had his kids present and didn't want any problems." After Brogdon went back inside the house, defendant "[threw] the shotgun over the fence" and proceeded to climb over the fence to enter the backyard.

As defendant himself would later observe, climbing over the fence was irrational and unnecessary because (1) the fence was topped with barbed wire and (2) he could have entered the yard through an unlocked gate—which is how Amezcua gained entry. Nevertheless, this part of Amezcua's account was corroborated by the fact that defendant was wearing a severely torn shirt and had scratches on his body at the time of his arrest. Police found a piece of fabric on the barbed wire and additional pieces on the ground, some of which contained defendant's DNA.

Amezcua did not stay in the backyard as long as defendant, and he claimed to have been walking back to the car when he heard a "loud bang." Although he denied seeing defendant fire the shotgun, Amezcua's story included other critical details. "[J]ust prior to hearing the loud bang," he saw a person inside the house who appeared to be "on the phone" and holding a second object in one of their hands. Amezcua further noted it appeared the person had "their cellphone flashlight on." This was consistent with the testimony of Brogdon's eldest son, who recalled that his father had activated a flashlight

5.

function on his phone. Amezcua also stated that the person with the phone was visible through the laundry room window.

In light of defendant's BAC at the time of his arrest, homicide detectives waited for approximately 14 hours before interrogating him. Defendant was initially relaxed and generally seemed unconcerned about being in custody. He claimed to have no memory of the events between his consumption of alcohol and getting pulled over by the CHP. When shown a photograph of the shotgun, he denied having ever seen it before.

When asked about Brogdon, defendant claimed they had a physical altercation about "a month ago." He denied having had any contact with Brogdon since the fight. The lead detective asked why they fought, and defendant answered, "Because I took his wife."

There was a significant change in defendant's demeanor after the lead detective informed him that Brogdon was dead. The People do not dispute that defendant appeared genuinely surprised by the information. Even the detective agreed that defendant reacted with "shock" and "grief."

Defendant eventually told the detective why he went to Brogdon's house. According to his story, Brogdon's wife and youngest children stayed with him after moving out of Brogdon's home. Defendant and the wife had recently quarreled, and now she "was going from hotel to hotel." Brogdon was aware of his wife's homelessness and told her that "he was gonna call the CPS" and "take the kids." Defendant felt responsible for the wife's predicament and was angry at Brogdon for "trying to take the kids from [her]."

Defendant confessed to "throwing the gun over [the fence] and jumping over and shooting the door." He also recalled attempting to open the door and finding it locked, which happened before he fired the shotgun. Defendant denied having any memory of seeing Brogdon or talking to him during the incident, except for over the phone.

6.

Defendant wanted to "hurt" Brogdon but not kill him.  His alleged intention was to "scare" Brogdon so that Brogdon would "back off" of the child custody dispute.

During his second day in custody, after having been interrogated the previous evening, defendant placed a recorded jail call to Brogdon's wife.  The wife did not express any sadness about Brogdon's death but seemed mad at defendant for having casted suspicion on her and other unnamed individuals.  She asked defendant, "What the hell did you tell them?"  He assured her, "I didn't tell them nothing."  She later complained, "[T]hey're trying to involve everybody else."  Defendant responded, "[T]hey didn't pull the trigger.  I did."

**Defense Case**

The defense rested without presenting any evidence.  Defense counsel argued for a conviction of voluntary manslaughter based on heat of passion.  (See *People v. Lasko* (2000) 23 Cal.4th 101, 104 [holding that heat of passion can reduce implied malice murder to voluntary manslaughter].)  Although the People elected to rely solely on a theory of implied malice, defense counsel also argued for voluntary manslaughter based on voluntary intoxication.

**Verdict and Sentencing**

The jury convicted defendant of second degree murder and found true the gun enhancement.  The trial court exercised its discretion to dismiss the prior strike allegation.  Defendant was sentenced to 15 years to life in prison for the murder, plus a consecutive term of 25 years to life for the enhancement.

## DISCUSSION

**Failure to Instruct on Involuntary Manslaughter**

Defendant contends the trial court had a sua sponte duty to instruct on involuntary manslaughter as a lesser included offense of murder.  The People argue that the evidence did not warrant such an instruction.  We agree with the People.

7.

Additional Background

An unreported jury instruction conference took place following the close of evidence. The trial court summarized those proceedings for the record: "The People confirmed that [they] are not pursuing Count 1 on a first-degree theory, [and] are only arguing second-degree [murder]. The Court has modified the proposed verdict forms and provided counsel the copies of those verdict forms. [¶] [Defense counsel] requested voluntarily [*sic*] manslaughter as a lesser included. There are no other lesser included offenses that would be supported by the evidence. And the defense is not seeking any additional lesser included offenses." Defendant's trial attorney confirmed the accuracy of the court's statements.

Legal Overview

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.) The instructional duty does not arise unless there is substantial evidence from which the jury could find that the lesser offense, but not the greater, was committed. (*People v. Licas* (2007) 41 Cal.4th 362, 366.) "Substantial evidence in this context is that which a reasonable jury could find persuasive." (*People v. Choyce* (2025) 18 Cal.5th 86, 104 (*Choyce*).) " '[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense ….' " (*People v. Moye* (2009) 47 Cal.4th 537, 553.) An appellate court reviews the failure to instruct on a lesser included offense de novo, considering the evidence in the light most favorable to the defendant. (*Choyce*, at p. 104; *People v. Campbell* (2020) 51 Cal.App.5th 463, 501.)

Murder is the killing of a human being with malice aforethought. (§ 187, subd. (a).) "A deliberate intent to kill constitutes express malice." (*People v. Morris* (2026) 19 Cal.5th 671, 678.) Implied malice generally refers to acting with a conscious disregard for a danger for human life. (*Ibid*; *People v. Mumin* (2023) 15 Cal.5th 176,

8.

190; see § 188, subd. (a)(2).)  "Because malice may be implied, second degree murder does not require a specific intent to kill."  (*Mumin*, at p. 190.)

Voluntary and involuntary manslaughter are lesser included offenses of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  "A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter."  (*People v. Bryant* (2013) 56 Cal.4th 959, 968.)  The mitigating circumstances will involve some form of provocation or imperfect/unreasonable self-defense.  (*Ibid.*)  Involuntary manslaughter, on the other hand, is defined by statute as a killing that occurs "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)

Although statutorily defined in terms of nonfelonious behavior, the definition of involuntary manslaughter has been judicially enlarged to include "a killing without malice in the commission of a noninherently dangerous felony."  (*People v. Bryant, supra*, 56 Cal.4th at p. 966.)  The definition was further expanded in *People v. Brothers* (2015) 236 Cal.App.4th 24, which held that an unintentional homicide committed "in the course of an inherently dangerous assaultive felony (that is, a killing not amounting to felony murder)" may constitute involuntary manslaughter if the defendant did not act with implied malice.  (*Id.* at pp. 32, 34.)  In that scenario, the evidence must show the defendant did not subjectively appreciate "the danger to human life his or her conduct posed."  (*Id.* at p. 35.)  There must be actual evidence, not merely speculation, that the defendant was not subjectively aware of the attendant risks.  (See *Choyce, supra*, 18 Cal.5th at p. 104 [speculation is not a sufficient basis for instructing on lesser included offenses].)  "Otherwise, an involuntary manslaughter instruction would be required in every implied malice case regardless of the evidence."  (*Brothers*, at p. 35.)

9.

<u>Analysis</u>

"Implied malice has both objective and subjective components. The objective test requires ' " ' "an act, the natural consequences of which are dangerous to life." ' " ' " (*People v. Bell* (2020) 48 Cal.App.5th 1, 14, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143.) "[T]he defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 989.)

Discharging a firearm at an inhabited dwelling, "considered in the abstract, involves a high probability that death will result and therefore is an inherently dangerous felony." (*People v. Hansen* (1994) 9 Cal.4th 300, 309, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1198–1199.) "[I]f a gunman simply walked down the hall of an apartment building and fired through the closed doors, he would be liable for the murder of all the victims struck by his bullets." (*People v. Taylor* (2004) 32 Cal.4th 863, 868.) Defendant does not dispute that his act of firing a shotgun at the back door of Brogdon's home satisfied the objective component of implied malice.

The subjective component is the "deliberate performance of the act with conscious disregard for life, knowing the act endangers another's life." (*In re Ferrell* (2023) 14 Cal.5th 593, 604.) This element "requires 'a determination that the defendant *actually appreciated* the risk involved.' " (*Ibid.*) "The mental component may be absent even if defendant's intentional acts are inherently dangerous in the abstract or would appear risky to a reasonable person." (*Ibid.*) The subjective element could be negated in a shooting death if, for example, the killer believed the gun was unloaded or incapable of firing. (See *People v. Velez* (1983) 144 Cal.App.3d 558, 561–562, 565–566; *People v. Walls* (1966) 239 Cal.App.2d 543, 544–545.)

In the example of a gunman firing into the door of an apartment, an involuntary manslaughter instruction might be warranted if there was evidence that he "knocked on doors and windows of the apartment before he shot" and "arguably had reason to believe

that the apartment was unoccupied." (*In re Hansen* (2014) 227 Cal.App.4th 906, 925, fn. 7 (*Hansen*).) In *Hansen*, the killer was "many feet away" from the victim's apartment when he fired multiple bullets at the dwelling from a handgun. (*Id.* at pp. 927, 912.) The killer testified that "he did not believe there was any chance anyone was inside the apartment at the time he shot at it" because he had gone to the apartment twice, "knocked on doors and windows, and did not get any response." (*Id.* at p. 924.) "Given this evidence, a rational juror could find that [he] lacked a subjective awareness that his actions carried a high probability of death because he did not think that anyone was in the apartment at the time he shot at it." (*Ibid.*)

Here, defendant denied having any memory of seeing Brogdon at any time during the incident, including the argument described by two eyewitnesses that took place while Brogdon was on his back stoop and defendant was on the other side of the fence. But claiming an inability to recall certain events is not the same as denying the events occurred. Even now, defendant does not deny that he knew the house was occupied. Defendant does point out that during his interrogation he claimed to "remember looking around" as he was walking toward the house and "didn't see nobody." This statement is merely consistent with the evidence that Brogdon went back inside the house before defendant climbed over the fence.

It is important to note that "[e]vidence of voluntary intoxication cannot be used to negate implied malice." (*People v. Parker* (2025) 113 Cal.App.5th 1261, 1269 (*Parker*).) Put differently, "voluntary intoxication is irrelevant to proof of the mental state of implied malice or conscious disregard." (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1300; accord, *People v. Soto* (2018) 4 Cal.5th 968, 981 (*Soto*).) Defendant's subjective appreciation of the danger posed by firing a shotgun at Brogdon's back door must be analyzed without any consideration of his drunkenness at the time.

Defendant's main argument is that he could not "see inside the house" through the closed laundry room door and exterior screen door. He thus contends "a reasonable juror

11.

certainly could have concluded that [he] did not know that Brogdon was just on the other side of the door where he could be impacted by the shotgun blast and did not subjectively appreciate and disregard the life-threatening danger." This argument fails for several reasons, especially when considered in light of the photographs admitted into evidence as People's Exhibits Nos. 29 and 30:





You can see into the laundry room through the window to the left of the exterior security door. This is the window through which Amezcua saw Brogdon "on the phone" and holding another object (presumably a knife) "just prior to hearing the loud bang." Amezcua noted that the "cellphone flashlight [was] on." Brogdon's son independently confirmed that his father had activated a flashlight function on his phone. The son also testified that lights were on in the adjacent "kitchen area," which would have further illuminated the laundry room.

Witnesses described Brogdon's house as small, which is supported by the crime scene photos. During his interrogation, defendant emphasized his familiarity with the layout ("I know that house from the inside out"). As a frequent guest who was there "all day every day" when he and Brogdon were still friends, defendant would have known that the window pictured above provided a view into the room behind the door.

Defendant obviously could not see through the laundry room door, but nothing prevented him from looking through the laundry room *window*. Unlike the shooter in

13.

*Hansen*, defendant made no statements indicative of any effort to determine whether the room into which he fired was empty. (*Hansen, supra*, 227 Cal.App.4th at p. 924.) The *Hansen* shooter also testified that "he did not believe there was any chance anyone was inside the apartment at the time he shot at it." (*Ibid.*) Defendant did not articulate any such belief with respect to the laundry room or the house in general.

Defendant relies on "[t]he fact that [he] appeared genuinely surprised and distraught by the news [of Brogdon's death]," but he cites no authority that such evidence warrants an instruction on involuntary manslaughter. The argument would be more persuasive if there was evidence he believed Brogdon was somewhere else in the house. He told the lead detective, "I don't know if he was in the back, front, kitchen, room, bathroom, shower …." In other words, defendant acted in conscious disregard of the distinct possibilty that Brogdon was still in the same room that defendant had just seen him enter a few minutes earlier.

Brogdon's cell phone data showed that his 911 call, which was placed at 2:49 a.m., lasted 14 minutes and 10 seconds. Gunfire was detected by the ShotSpotter sytem at appoximately 2:56 a.m., meaning the 911 call was in progress when Brogdon was killed. Brogdon's phone was found next to his head in a pool of blood on the laundry room floor. These facts indicate a likelihood that defendant heard Brogdon talking to the emergency dispatcher on the other side of the laundry room door.

The totality of the evidence permits only two possible inferences. Defendant either knew Brogdon was inside the laundry room or he was uncertain of Brogdon's location but made absolutely no effort to determine whether the laundry room was empty or occupied. Both scenarios demonstrate a conscious disregard for the risk of death posed by the act of firing a shotgun directly into the laundry room door.

Defendant also relies on his trial attorney's contention, asserted during closing argument, that "normally birdshot is not going to fatally injure someone." There was no trial evidence to support the quoted statement, and it is "axiomatic that the unsworn

14.

statements of counsel are not evidence." (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11.) Defendant's general familiarity with the power of a shotgun was established by his admission to police that he had fired a shotgun six weeks earlier, on the Fourth of July. When police executed a search warrant at defendant's residence, they found an "expended shotgun shell" and unfired 20-gauge ammunition.

To the extent defendant now insinuates he did not believe or expect that a shotgun blast would penetrate both the metal screen of the security door and the laundry room door, the evidence is again lacking. The jury could only speculate as to defendant's subjective knowledge and belief in that regard. "However, speculation is not evidence and will not warrant the giving of an instruction on a lesser included offense." (*Choyce, supra*, 18 Cal.5th at p. 104.)

### Failure to Instruct on Unconsciousness

Defendant claims the trial court had a sua sponte duty to instruct the jury pursuant to CALCRIM No. 626. This pattern instruction explains that unconsciousness resulting from voluntary intoxication can reduce the crime of murder to involuntary manslaughter. However, as defendant ultimately concedes in his reply brief, unconsciousness by voluntary intoxication can only negate express malice, not implied malice. (*People v. Carlson* (2011) 200 Cal.App.4th 695, 707 (*Carlson*).) The claim of instructional error fails for the following reasons.

### Additional Background

The prosecutor did not reveal his decision to forgo a theory of express malice until midway through his closing argument. At that point, the jury had already been instructed that voluntary intoxication could be considered for the purpose of determining whether defendant acted with the intent to kill. After discussing the circumstantial evidence of an intent to kill Brogdon, the prosecutor somewhat ambiguously conceded the evidence was susceptible of competing inferences and thus would not support a finding of express malice.

15.

The defense closing included a cursory argument for voluntary manslaughter based on intoxication. This consisted of noting defendant's BAC at the time of his arrest and reciting a portion of the court's voluntary intoxication instruction. The defense did not argue any theories of unconsciousness.

In rebuttal, the prosecutor more clearly asserted that the evidence would not support a finding of express malice beyond a reasonable doubt. "That's why I'm not submitting to you that this is express malice murder. That is why I'm expressing to you that this is implied malice." The prosecutor went on to correctly state, "Voluntary intoxication doesn't apply to implied malice murder. It applies to express malice murder."

Law and Analysis

CALCRIM No. 626 is based, in pertinent part, on the following language in *People v. Ochoa* (1998) 19 Cal.4th 353: "When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*Ochoa*, at p. 423.) The crimes in *Ochoa* (a death penalty case) were committed in 1987, and the appellant's claim of instructional error with regard to unconsciousness was governed by the law in effect at that time. (*Id.* at p. 381; see *People v. Rangel* (2016) 62 Cal.4th 1192, 1227, fn. 12.) Although CALCRIM No. 626 does not distinguish between express malice and implied malice, case law restricts its application to intentional homicides.

"Section 29.4 addresses the admissibility of evidence of voluntary intoxication. Under the law, as it existed before 1995, the California Supreme Court held that evidence of voluntary intoxication was admissible to negate malice aforethought, regardless of whether such malice was express or implied. [Citation.] The next year, the Legislature amended section 22 (the predecessor to section 29.4) to provide: 'Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually

16.

formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored *express* malice aforethought.' [Citations.] Cases have recognized that the Legislature amended the statute to … prohibit evidence of voluntary intoxication to negate implied malice. [Citations.] As amended, when a defendant has been charged with murder, section 29.4 permits evidence of voluntary intoxication only in deciding whether the defendant acted with deliberation, premeditation, or with an intent to kill (express malice)." (*Parker, supra*, 113 Cal.App.5th at p. 1269.)

In *People v. Boyer* (2006) 38 Cal.4th 412, our Supreme Court observed that in light of the 1995 amendment to former section 22, "it now appears that defendant's voluntary intoxication, even to the point of actual unconsciousness, would not prevent his conviction of second degree murder on an implied malice theory." (*Boyer*, at p. 469, fn. 40.) The statement was dictum, but the same conclusion was reached in *Carlson, supra*, 200 Cal.App.4th 695. The *Carlson* opinion holds that the prohibition against considering voluntary intoxication to negate implied malice is absolute and *not* subject to an unconsciousness exception. (*Id.* at p. 707.) The *Carlson* opinion was cited with approval in *Soto, supra*, 4 Cal.5th 968, 981, which addressed a different issue but confirmed "that evidence of voluntary intoxication is not admissible on the question of implied malice, that is, to prove that defendants did not know of the danger they were creating by their actions, or that they did not consciously disregard that danger." (*Id.* at p. 977.)

In his reply brief, defendant concedes that CALCRIM No. 626 was not applicable to the People's theory of implied malice murder. Nevertheless, in an effort to salvage his claim, defendant argues the omission of CALCRIM No. 626 may have prejudiced him if the jury's verdict of second degree murder was based on a theory of express malice. Put differently, he contends that if the jury believed he acted with the intent to kill, it might have convicted him of involuntary manslaughter based on unconsciousness by voluntary

intoxication. This argument makes little sense, considering the jury was instructed on voluntary intoxication pursuant to CALCRIM No. 625, i.e., on the consideration of voluntary intoxication for the sole purpose of negating express malice. Defendant fails to explain why, if the jury believed he intended to kill Brogdon but was so drunk he did not know what he was doing, it would not have acquitted him of murder and found him guilty of voluntary manslaughter. The murder verdict dispels any theoretical possibility of prejudice.

The claim also fails for lack of substantial evidence to warrant the omitted instruction. "Defendant's professed inability to recall the event, without more, was insufficient to warrant an unconsciousness instruction." (*People v. Rogers* (2006) 39 Cal.4th 826, 888.) The mere fact of intoxication is also insufficient, even at high BAC levels. In *Carlson*, a combination of memory loss and significant intoxication was not enough to support a CALCRIM No. 626 instruction. The appellant had a BAC of 0.218 percent and self-professed memory loss and also elicited expert testimony "that she suffered an alcohol-related blackout on the night of the accident." (*Carlson, supra*, 200 Cal.App.4th at pp. 701, 704.) The trial court's refusal to instruct on unconsciousness was upheld on appeal based on the " 'complicated and purposive nature' " of the appellant's conduct during and after the incident, including her ability to understand and answer the questions of paramedics and police. (*Id.* at pp. 704–705, quoting *People v. Halvorsen* (2007) 42 Cal.4th 379, 418.)

*Halvorsen* involved a death penalty appellant who "daily and habitually drank to excess with resultant memory losses" and had a BAC of 0.154 percent "at the time of his arrest some two hours after the shootings." (*People v. Halvorsen, supra*, 42 Cal.4th at pp. 418–419.) The trial court's refusal to instruct on unconsciousness was affirmed based on "[t]he complicated and purposive nature of [the appellant's] conduct in driving from place to place, aiming at his victims, and shooting them in vital areas of the body." (*Id.* at p. 418.) "That he did not, by the time of trial, accurately recall certain details of the

shootings does not support an inference he was unconscious when he committed them."
(*Ibid.*)

Defendant's BAC was 0.17 percent within 30 minutes of shooting Brogdon, and there was evidence he experienced genuine memory loss. However, he purported to recall throwing his shotgun over Brogdon's fence, climbing over the fence himself, walking up to the back door and trying to open it, realizing it was locked, and then firing at it. He had the presence of mind to immediately flee the scene, and he informed detectives of the route he traveled to reach the highway. While driving on the highway, he responded to the flashing lights of a CHP patrol car by pulling over to the side of the road. A CHP officer testified that defendant subsequently complied with a verbal command to "put your hands where we can see them" by putting his hands out the window. Given the ample, uncontroverted evidence of conscious behavior and decisionmaking, the trial court was not obligated to provide a CALCRIM No. 626 instruction.

**Failure to Instruct With CALCRIM No. 334**

" '[W]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration." (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) Those principles are found in section 1111 and are summarized for jurors in CALCRIM No. 334. Defendant alleges the trial court had a sua sponte duty to provide this instruction with regard to the testimony of Anthony Amezcua. We disagree. Further, even if error could be found, such error was undoubtedly harmless.

Background

A hearing was conducted pursuant to Evidence Code section 402 concerning the People's intention to call Anthony Amezcua as a witness during its case-in-chief. Amezcua was called to the stand and immediately asserted his constitutional right against self-incrimination. This was expected, and the prosecutor introduced an immunity

19.

agreement reached between the People and Amezcua's legal counsel. The prosecutor also filed a written petition for an order requiring Amezcua to answer questions under oath pursuant to a grant of use immunity. (See *People v. Cooke* (1993) 16 Cal.App.4th 1361, 1366 [explaining use immunity].)

The People's petition summarized the anticipated substance of Amezcua's testimony: "Amezcua heard Mr. Brogdon say that he had kids in his home. Mr. Amezcua could see [Brogdon] [i]nside of the home because there was a light from the phone in the window. Mr. Amezcua tried to get [defendant] to stop, but told law enforcement officers that [defendant] 'didn't' get [*sic*] a fuck.' Mr. Amezcua walked back to the car. After the shot was fired, [defendant] ran back to the car and drove himself and Mr. Amezcua away from the scene until they were stopped by CHP."

The trial court granted the petition and ordered Amezcua to testify. The hearing continued with Amezcua answering questions but claiming to have almost no memory of the incident. He did provide one notable, affirmative response to one of the questions. The prosecutor asked, "Did you try to stop [defendant] from going inside the gate of that residence?" Amezcua replied, "I think so, yeah."

When called to testify before the jury, Amezcua again claimed to have severe memory loss. The prosecutor attempted to show Amezcua tried to prevent the shooting, but Amezcua denied it. He answered "No" when asked, "Did you, at any point, go to one of [defendant's] … friend's houses, and get out of the car and tr[y] to run inside and stop [defendant]?" The prosecutor then asked, "Did you tell police that at some point you tried to run inside and stop [defendant] because there were kids there?" Amezcua replied, "I don't remember talking to no police."

The prosecutor also asked Amezcua to confirm he was granted "use immunity for accessory to a crime, [i.e., section] 32." He responded, "I don't remember." Defense counsel asked only one question on cross-examination, which was done to impeach Amezcua's credibility based on crimes of moral turpitude. Amezcua admitted to being

20.

convicted in 2023 (approximately four years after the events in this case) of armed robbery and attempted murder.

The next witness was the detective who had interrogated Amezcua. According to the detective, Amezcua provided two versions of his involvement at Brogdon's house. In the first version, Amezcua never got out of the car. The second version is the one summarized in earlier parts of this opinion.

As told to the jury, Amezcua witnessed Brogdon tell defendant that he "didn't want any problems" because his children were present. He then saw Brogdon go "back into the residence." Amezcua "eventually went back to the car." "As he was approaching the car, he heard a loud bang." "[J]ust prior to hearing the loud bang," Amezcua had seen Brogdon through "the rear window in the laundry room that leads to the back yard."

The defense did not contend Amezcua was an accomplice to the shooting or request any jury instructions regarding accomplices. The word "accomplice" does not appear anywhere in the trial transcript. In closing arguments, however, defense counsel made the following remarks:

> "Mr. Amezcua was being investigated himself. Any statements that he purportedly heard [defendant] say, I would ask you to keep in mind that Mr. Amezcua was probably trying to save his own bacon. Whether that was successful, we don't know. But, when you consider what the People have offered as Amezcua's statement of what he heard from [defendant], I would ask you to view that with a jaded eye and jaded ear."

Law and Analysis

"Section 1111 codifies common law concerns about the reliability of accomplice testimony. [Citation.] '[S]uch testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 (*Gonzales and Soliz*).) The statute provides that a conviction cannot be based on accomplice testimony

21.

unless the testimony is "corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) The statute defines "accomplice" as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*)

"Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone." (*People v. Valdez* (2012) 55 Cal.4th 82, 147.) "It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified." (*Id.* at p. 148.) " 'It is only required that the evidence " ' "tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth." ' " ' [Citations.] The necessary corroboration may involve a defendant's own statements." (*People v. Aguirre* (2025) 18 Cal.5th 629, 675–676.)

CALCRIM No. 334 explains the above principles and concludes with the following admonishment: "Any (statement/[or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/[or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

CALCRIM No. 334 also correctly informs jurors that the burden of proving a witness's status as an accomplice lies with the defense. (Accord, *People v. Martinez* (2019) 34 Cal.App.5th 721, 729.) A person who is only an accessory to the charged crime is not an accomplice, and CALCRIM No. 334 does not apply to the testimony of such individuals. (*People v. Anderson* (2018) 5 Cal.5th 372, 412–413; *People v. Horton* (1995) 11 Cal.4th 1068, 1113–1114.) "[I]f the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that

22.

determination and, in that situation, need not instruct the jury on accomplice testimony." (*Horton*, at p. 1114.)

The trial court did not make a determination as to Amezcua's status because nobody alleged that he was an accomplice. The People attempted to portray him as a mere accessory, and they dispute defendant's belated contention that Amezcua was subject to liability for Brogdon's murder as an aider and abettor. We decline to resolve the issue of whether an accomplice finding was possible. Assuming there was a basis to instruct the jury with CALCRIM No. 334, the alleged error was harmless.

The test for prejudice is well established. "It has been recognized that the failure to instruct on accomplice testimony pursuant to section 1111 is harmless where there is sufficient corroborating evidence in the record." (*People v. Miranda* (1987) 44 Cal.3d 57, 100; accord, *People v. Whisenhunt* (2008) 44 Cal.4th 174, 215.) If the record does not contain such evidence, the error is evaluated under the standard described in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Gonzales and Soliz, supra*, 52 Cal.4th at p. 304.) If the record *does* contain sufficient corroborating evidence, no further analysis is required. (*Id.* at pp. 303–304.)

Defendant readily concedes, as he must, that Amezcua's testimony was sufficiently corroborated by other trial evidence. The corroboration included defendant's own admissions to "throwing the gun over [the fence] and jumping over and shooting the door." Additional details provided by Amezcua were independently corroborated by Brogdon's son, e.g., Brogdon's use of a flashlight function on his cell phone.

Defendant argues the corroboration of Amezcua's testimony does not cure the failure to instruct the jury to view Amezcua's testimony "with caution" (see CALCRIM No. 334). Our Supreme Court has rejected substantively identical claims. As stated in *People v. Williams* (1997) 16 Cal.4th 153, "A trial court's failure to instruct the jury that

it should view an accomplice's testimony with distrust does not prejudice the defendant when the record contains sufficient corroborating evidence."[4] (*Id.* at p. 226.)

In *Gonzales and Soliz*, an appellant made essentially the same claim as defendant presents here. The appellant argued that regardless of whether an accomplice's testimony is corroborated by other evidence, "the omission of CALJIC No. 3.18 (accomplice's testimony to be viewed with distrust) … must be separately examined for harmless error under *Watson*." (*Gonzales and Soliz, supra*, 52 Cal.4th at p. 303.) Our Supreme Court expressly rejected the argument and held that sufficient corroboration eliminates prejudice even when "the full complement of accomplice instructions has been omitted." (*Id.* at p. 304.)

CALCRIM No. 334's use of the phrase "with caution" instead of "with distrust" does not change the analysis. (See fn. 4, *ante*.) "The rationale for instructing a jury to view with caution an accomplice's testimony that incriminates the defendant is the accomplice's self-interest in shifting blame to the defendant. [Citation.] Not giving such instructions, however, is harmless, even if erroneous, when there is 'ample evidence corroborating the witness's testimony.' " (*People v. Cook* (2006) 39 Cal.4th 566, 601.)

Notwithstanding the precedent on this issue, defendant's claim would fail under any standard of prejudice. In cases where it is known that an accomplice was arrested in connection with the charged crime, jurors will already be "inclined to view [the] testimony with caution even in the absence of an instruction." (*People v. Williams* (2010) 49 Cal.4th 405, 456; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 155.) Defendant's

---

**4**      Prior to the Judicial Council's endorsement of the CALCRIM pattern instructions, trial courts used multiple CALJIC instructions, including CALJIC Nos. 3.12 and 3.18, to explain to jurors the principles now collectively set forth in CALCRIM No. 334. (See, e.g., *People v. Riggs* (2008) 44 Cal.4th 248, 311–312.) Whereas the current pattern instruction and post-1995 versions of CALJIC No. 3.18 state that accomplice testimony should be viewed "with caution" if it tends to incriminate a defendant, earlier versions of CALJIC No. 3.18 used the phrase "with distrust." (*People v. Guiuan* (1998) 18 Cal.4th 558, 563; CALJIC No. 3.18 (6th ed. 1996) p. 147.)

jury was instructed pursuant to CALCRIM No. 226 regarding the evaluation of witness testimony. The instruction told jurors to rely on their "common sense and experience" and consider whether a witness had "a personal relationship with someone involved in the case, or a personal interest in how the case is decided."

The jury also knew of Amezcua's criminal history, and it was instructed pursuant to CALCRIM No. 316 that it could consider the evidence in evaluating his credibility. Defendant focuses on Amezcua's recital of defendant's alleged statements about wanting to kill Brogdon, but he does not address the trial court's separate instruction pursuant to CALCRIM No. 358: "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

"Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The jury's verdict would have undoubtedly been the same with or without the additional "with caution" instruction in CALCRIM No. 334.

**Admissibility of Defendant's Custodial Statements**

Defendant alleges some of his custodial admissions were the product of unlawful interrogation tactics. Specifically, an implied promise of leniency in exchange for incriminating statements. These issues were not raised in the trial court, and the People make a strong forfeiture argument. Regardless of forfeiture, the claim fails on the merits. First, an improper promise of leniency does not affect the admissibility of a subsequent confession unless the promise was a motivating cause of the decision to confess. The required causal connection is missing here. Second, even if causation were present, admitting the affected statements was harmless.

Additional Factual Background

Defendant was arrested on August 15, 2019, at approximately 3:30 a.m. for having a BAC of 0.17 percent, i.e., more than twice the legal limit for driving (see Veh. Code, § 23152, subd. (b)). He was interrogated approximately 14 hours later. As shown in an

25.

unedited video marked as Court Exhibit 2, two homicide detectives brought him into an interview room at 4:43 p.m. Defendant was given a burrito and a soda, and he was left alone for approximately 25 minutes to eat the meal. The detectives returned at 5:10 p.m., and defendant was advised of his *Miranda*[5] rights. There are no issues on appeal regarding defendant's valid waiver of those rights.

The interrogation began with approximately seven minutes of general background questions. Defendant was asked if he has any children, and he said, "Yeah." When asked about their ages, he answered, "Two and three."

At approximately 5:18 p.m., the questioning turned to the events of the previous evening. Defendant described getting drunk on shots of rum and claimed to have no memory of what happened before he was pulled over by the CHP. The lead detective showed him a photograph of the seized shotgun, and defendant told him, "I've never seen it."

A few minutes later, the detective showed defendant a picture of Brogdon. Defendant smiled and chuckled as he admitted knowing the person in the photograph. Defendant claimed that Brogdon and "his homies" had "jumped" him approximately one month earlier.

The detectives eventually told defendant they knew he had contact with Brogdon shortly before defendant's arrest. Defendant said he had no memory of being in Brogdon's neighborhood. When confronted with more details and allegations about the shooting, including the evidence of him tearing his shirt and cutting his arms on the barbed wire, defendant continued to deny having any memory of being at the house or seeing Brogdon.

Defendant eventually admitted that he remembered CHP officers removing the shotgun from his car. Amid his continued denials about being at Brogdon's house, he

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

was asked, "If you can think of all the reasons why you would go there last—early this morning, why would you go there?" Defendant answered, "Probably, I don't know, uh hatred, or probably gonna, try and fight him or somethin', I don't know."

Roughly 45 minutes into the interrogation, the lead detective told defendant that the shotgun seized from his vehicle was fired into Brogdon's door. The detective also said that Brogdon's sons had reported seeing defendant at the house. Defendant sat silently for a few seconds before asking if the kids were okay. The detective replied, "Yeah, they're okay." After a few more questions and answers, defendant said, "If the kids are okay, what's done is done, and nobody got hurt, you know. Uh, the thing is—the good thing is that nobody got hurt."

The detective said, "Well, I didn't say nobody. I said the kids are okay." Defendant then asked about Brogdon, but the detective pivoted to a set of questions about defendant's own children. Defendant's claim on appeal is based on the following exchange:

> "Q1: [Do] you want to be there for them, or you want someone else to raise those kids?
>
> "A: Fuck no, I want to be there.
>
> "Q1: You want to be there. Right? Well guess what, in order for you to be there, be able to support those kids, you need to be hon- you need to tell us what the hell happened now. I'm not—I'm not bullshitting you, man.
>
> "A: I know.
>
> "Q1: You know what I mean? Because they need you. You don't want any homie raising those kids, right? 'Cause they're not gonna raise 'em like you raise 'em. They're not gonna give them the love you give 'em. Right? And I already know, you have—you have problems. You had a beef with [Brogdon]. I know you guys were boys before, but some shit happened because of [his wife]. You took his lady. All right? You guys got in a fight.
>
> "A: Yeah. I don't even really remember going around to his house.

27.

"Q1:   What's that?

"A:    I really don't remember going to his house.  That's idiotic.  I mean, part of- part of me that's—to me that's idiotic.  But uh…

"Q1:   Because you were drinking and you thought you were [a] badass that's why you went over there.  Am I right?  You had some liquid courage in you and you said I'm gonna go fuck up [Brogdon].  Right?  Isn't that usually what happens?

"A:    Yeah.  Where's [Brogdon]?

"Q:    You want to talk to him?

"A:    Yeah.

"Q1:   [Brogdon]'s no longer with us, man.

"A:    He's dead?

"Q1:   [Brogdon]'s dead.  Now you know how serious this shit is?  Now we need to know why it happened.  We already know it happened.  All the other shit you've done, I don't care.  We don't care about that.  That's—that's nothing.  We want to know why this happened.  These are crime scene photos."

The implied promise of leniency relating to defendant's ability to raise his children occurred at approximately 6:00 p.m., roughly 50 minutes into the interrogation.  Next, as shown above, the detective immediately segued into revealing that Brogdon was dead.  Defendant's reaction to the information about Brogdon was, as all parties agree, visible "shock" and professed disbelief.  At approximately 6:05 p.m., the detectives initiated a break and left the room for eight minutes.

During this first break, defendant appeared distraught and tearful.  At one point he angrily slammed his hands on a table and banged his head against a wall.  He was crying when the detectives returned to the room.

The questioning resumed at 6:14 p.m. and continued for about 17 minutes until the next break.  During that time, defendant expressed remorse and anger at himself, e.g., "Shoulda been me" "[t]hat died" and "I'm a piece of shit."  However, he still claimed to

28.

have no memory of the shooting. He also alleged that Brogdon had recently pulled a gun on him, which made defendant feel "numb" and filled with "so much hatred." Defendant then said, "[B]ut, that doesn't give [him] a reason to kill [Brogdon]" and he "wouldn't have killed [Brogdon] for that."

The detective asked, "What was your plan when you went over there today?" Defendant answered, "I didn't have a plan … nothing of this was planned." He gave a similar response when asked about his "purpose" for going there: "I really don't know what—how the fuck I ended up over there." The detective then asked if defendant was trying to scare Brogdon. Defendant replied, "I don't remember." Defendant also volunteered to take a polygraph test to prove his inability to recall the events.

After further expressing disbelief that Brogdon was actually dead, defendant promised to tell "the truth" if the detectives gave him a cigarette. The lead detective left the room to find one, returned, and then took defendant outside for a smoke break. This second break in the interrogation lasted 10 minutes, and the questioning resumed at approximately 6:42 p.m.

The final segment of questioning inside the interview room lasted about 17 minutes. It began with defendant telling an incomplete story about making two trips to Brogdon's house. On the first trip, at an unspecified time of night, defendant "scoped it out" but did not see Brogdon. Defendant noted, "I didn't want to hurt him. I just wanted to fight him."

Next, defendant went back to his own residence to "get more booze." His memory of what happened next was allegedly poor and fragmented. He admitted having a general recollection of calling Brogdon and speaking to him over the phone. He could not remember what was said during the call. His next memory was of being "in the middle of the road on the highway."

The detectives expressed skepticism about defendant's inability to recall the most important details of the night. Defendant said that he assumed he brought the shotgun

29.

with him since the detectives were claiming he shot and killed Brogdon, but he denied remembering the incident. He stated, for example, "I don't remember being in the backyard" and "I don't remember killing [Brogdon]."

The detectives ended the interrogation at approximately 6:59 p.m., shortly after defendant volunteered for a second time to take a "lying detector test." Defendant made that offer in response to the lead detective telling him he was "being arrested for murder." As the detective was exiting the room, defendant asked if he could make a phone call to his mother. This had been discussed earlier, and the detective replied, "Hold on."

The video recording continues for approximately 11 more minutes, during which time the detective returned and told defendant that he would facilitate the phone call after defendant spoke to some other officers. This was in reference to a separate investigation into defendant's involvement in a series of liquor store and convenience store robberies.

The video ends with defendant sitting alone in the room at 7:10 p.m. As documented in an unedited audio recording marked as Court Exhibit 3, the lead detective met with defendant again approximately 30 minutes later. The audio recording begins with the following statement: "Today is August 15, 2019. The time is [7:39 p.m.] I will be allowing [defendant] to make a phone call to his parents."

The detective made two unsuccessful attempts to contact defendant's mother (each call went to her voicemail). He offered to call defendant's father, but defendant said that his father had lost his phone. Defendant declined to call anyone else, and the detective stated, "I'm pretty much finished with you unless you have something else? [¶] … [¶] Do you remember what else happened? Wanna tell me?" In response, defendant began telling the story about Brogdon "trying to take the kids" from Brogdon's wife. The detective expressed confusion, which led to the following exchange:

> "Q: She's gonna lose the kids because of you? When? 'Cause of this or because something yesterday. You're losing me man.
>
> "A: I wanna tell you but…

30.

"Q:	But what?  Tell me.

"A:	I'm fucked.

"Q:	Exactly.  You're … I'll be honest, you're a fucked man.  I mean…

"A:	I'm [*never coming out*].[6]

"Q:	…but—huh?

"A:	(Unintelligible)  I'm never coming home.

"Q:	You're not coming out, … you know that, right?  I mean what else do you have to lose, other than making it and be honest at least the— at least the judge will know, 'Hey, he made a mistake.'  If it even gets that far.  'He made a mistake and, uh, he was cooperative and he was being honest.'  And I tell you what, that looks a lot better than, 'I don't remember' or being untruthful.[7]

"A:	Okay.  If I tell you, well this part—I don't know—I really honestly don't remember showing up or being (unintelligible) you know [Brogdon's wife] or, you know, jumping the fence or stuff like that.  But I know why I went over there.

"Q:	You know why you would go over there?  Why is that?

"A:	Because—because of (unintelligible).

"Q:	You have to speak up, too, man.

"A:	[Brogden] was trying to take the kids from [his wife]."

Defendant proceeded to explain the situation involving Brogdon's wife staying in hotels and Brogdon telling her that "he was gonna call the CPS."  Defendant went on to admit ownership of the shotgun, throwing the shotgun over the fence, climbing over the fence, trying to open the back door, and shooting the door.  However, he denied any

---

**6**	Italicized text in brackets was audible on the recording but marked as "unintelligible" on the corresponding transcript.

**7**	Defendant does not allege that any of these statements were coercive or otherwise improper.

memory of seeing or talking to Brogdon. Defendant twice stated, "I didn't wanna kill him."

The detective later asked why defendant waited so long to admit those details. Defendant replied, "I didn't wanna believe it." He also reiterated that he honestly did not remember certain parts of the incident. The questioning ended at approximately 8:00 p.m.

### Additional Procedural Background

Defendant's trial counsel made an oral motion in limine to exclude defendant's custodial statements on grounds of "*Miranda* and voluntariness." The *Miranda* component is not at issue here. As for the involuntariness argument, defendant admits that the motion was undeveloped and vaguely based only on his intoxication at the time of his arrest.

Defendant's trial counsel relied on defendant's emotional and volatile behavior during the first break in the interrogation, e.g., banging his head against the wall, as evidence that he was still under the influence of alcohol. The trial court noted defendant had just been informed of Brogdon's death a few minutes earlier, and the court impliedly found a causal connection to that information rather than to any lingering effects of alcohol. Accordingly, the motion was denied.

### Forfeiture

The admission of defendant's custodial statements is now being challenged on an entirely different basis than was asserted in the trial court, i.e., coercion by a promise of leniency. "As a consequence of the issue not having been raised below, 'the parties had no incentive to fully litigate this theory … and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings.' [Citation.] Accordingly, the claim of involuntariness of defendant's statements and confession is not preserved for appeal." (*People v. Cruz* (2008) 44 Cal.4th 636, 669.)

32.

Defendant all but concedes his claim was forfeited.  Nevertheless, he pushes to have it resolved either on the merits or under the rubric of ineffective assistance of counsel.  It is easier to dispose of the claim on the merits, which is how we will proceed.  (See, e.g., *People v. Cruz, supra*, 44 Cal.4th at p. 669; cf. *People v. Hardy* (1992) 2 Cal.4th 86, 209.)

Applicable Law

" 'Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' " (*People v. Wall* (2017) 3 Cal.5th 1048, 1065 (*Wall*).)  It is the People's burden to establish voluntariness by a preponderance of the evidence.  (*Id.* at p. 1066.)  The issue presents "a mixed question of law and fact that is nevertheless predominantly legal" and subject to de novo review.  (*People v. Mickey* (1991) 54 Cal.3d 612, 649 (*Mickey*); accord, *People v. Linton* (2013) 56 Cal.4th 1146, 1177 ["The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."].)

" '[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' " (*People v. Tully* (2012) 54 Cal.4th 952, 985.)  Examples of leniency include being released from custody, avoiding serious charges, or receiving a lighter sentence than would otherwise be imposed for a crime.  (*People v. Holloway* (2004) 33 Cal.4th 96, 115; *People v. Vasila* (1995) 38 Cal.App.4th 865, 874–875.)  As with other forms of coercion, a promise of leniency does not render a subsequent confession involuntary unless it is the " 'proximate cause' " of the defendant's self-incrimination.  (*Mickey, supra*, 54 Cal.3d at p. 647.)

Causation is determined by the totality of the circumstances.  (*Wall, supra*, 3 Cal.5th at p. 1066; *People v. Winbush* (2017) 2 Cal.5th 402, 452.)  This requires consideration of "both the characteristics of the accused and the details of the

33.

interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.) Relevant characteristics of the accused include "his 'age, sophistication, prior experience with the criminal justice system and emotional state.' " (*People v. Vasila, supra*, 38 Cal.App.4th at p. 876.) Relevant details of the interrogation include " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; [and] its continuity.' " (*People v. Williams* (1997) 16 Cal.4th 635, 660, fourth bracketed insertion added; accord, *Winbush*, at p. 452.)

Absence of Causation

Reviewing courts independently determine "the presence of coercive state activity and the existence of causality." (*Mickey, supra*, 54 Cal.3d at p. 649.)

The law generally prohibits "even a mild promise of leniency." (*Brady v. United States* (1970) 397 U.S. 742, 754; see *People v. Neal* (2003) 31 Cal.4th 63, 79 [a statement is involuntary if " ' " 'obtained by any direct or implied promises, however slight' " ' "].) Here, the lead detective plainly conveyed that defendant's ability to raise his children would be impacted by his willingness or unwillingness to admit and explain what he did at Brogdon's house. This interrogation technique was coercive and improper. However, that still leaves the question of whether a causal connection existed between the attempted inducement and defendant's subsequent incriminating statements. (*People v. Cunningham* (2015) 61 Cal.4th 609, 643.)

Defendant's argument for causation is largely based on a misinterpretation of part of the initial interrogation (technically, it is appellate counsel's misinterpretation of the record). Following the first break in the interrogation, the lead detective resumed his questioning by saying, "Just be honest, what's goin' through your head right now?" A transcript prepared from the video indicates that defendant replied, "The kids." His appellate counsel submits defendant was referring to his own children, which allegedly "shows the big impact" of the detective's earlier improper statements regarding defendant's desire and ability to "raise those kids."

34.

The transcript is not accurate. Defendant's initial response was not "*the* kids." He said either "four kids" or "poor kids." The detective indicated that he did not hear the answer, and then defendant said, "The kids." The next question was, "What else?" The transcript shows the response as "(Unintelligible)," but on the video defendant can clearly be heard saying, "They're going to grow up without a dad." He repeats the statement a second time, and the detective proceeds to ask what else he is thinking about. The transcript correctly shows his response to that question: "I'm done for. [¶] … [¶] I'm done for." Those statements were followed by "[s]houlda been me [¶] … [¶] [t]hat died" and "I'm a piece of shit."

What defendant said and meant by his statements are factual issues that would have been determined by the trial court had he properly raised the issue below. On direct appeal from a trial court's rejection of an involuntariness claim, conflicting inferences are drawn in favor of the People. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 357; *People v. Dykes* (2009) 46 Cal.4th 731, 752.) Brogdon had four children; defendant had two children. "[F]our kids" was obviously a reference to Brogdon's children.

Even if the words were interpreted as "poor kids," defendant's next statement does not permit any inferences supportive of his causation argument. "They're going to grow up without a dad" is most logically construed as referring to Brogdon's "kids." But if we assumed defendant was talking about his own children, that would show a lack of causation vis-à-vis the detective's prior improper statements. If defendant believed his cooperation was going to make it possible to raise his kids instead of being incarcerated during their childhood, he would not have said, "They're going to grow up without a dad." The same is true of his repeated lament, "I'm done for."

Further, as conceded in his briefs, defendant's admissions to owning the shotgun, climbing over the barbed wire fence, and remembering that he shot the door were not made until the final stage of questioning. The detective's improper conduct occurred at approximately 6:00 p.m., but the final stage of questioning began at approximately

35.

7:40 p.m. Moreover, those admissions were immediately preceded by expressions of hopelessness, e.g., "I'm never coming home." And the detective expressly *agreed* with him, e.g., "You're not coming out, … you know that, right?" In addition, defendant had already been told he was being "arrested for murder" and going to jail.

The totality of the circumstances strongly demonstrates the absence of causation. Defendant was given a meal prior to the interrogation and treated respectfully throughout the questioning. The detectives maintained a calm and nonaggressive demeanor the entire time. The interview room was well lit and relatively spacious.

The duration of questioning was less than three hours, with three breaks. The first segment lasted approximately 55 minutes and was followed by a 10-minute break. The second segment lasted approximately 17 minutes, followed by another 10-minute break. The third segment was also roughly 17 minutes. The formal questioning ended shortly before 7:00 p.m., and nearly 40 minutes elapsed before the lead detective facilitated two unsuccessful phone calls to defendant's mother—which was done at defendant's request. The final segment of questioning lasted approximately 20 minutes.

Defendant's appellate counsel notes his youth and supposed "lack of experience with the criminal justice system" at the time of the incident. The fact defendant was 18 years old is supportive of his position. The second contention, however, is not accurate.

The interrogation recordings were edited for trial to redact evidence of defendant's affiliation with a local gang and history of arrests. On the unedited video, defendant discloses a prior arrest for robbery, for which he spent "a year in juvie," and makes references to having "priors" and previously being "locked up." As earlier noted, defendant's prior strike under the Three Strikes law was based on a juvenile adjudication for robbery.

Defendant appeared relaxed during the first 45 minutes of questioning and did not appear particularly concerned about being in custody. He was restrained by an ankle cuff

36.

that was chained to the wall, but this did not appear to bother him either.  He even re-cuffed himself after the second break (the cigarette break) without being asked or instructed to do so.

Although " 'no single factor is dispositive' " (*Wall, supra*, 3 Cal.5th at p. 1066), "the timing and sequence of events" is important (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 884).  For example, causation was found in *Gonzalez* and *People v. Perez* (2016) 243 Cal.App.4th 863 based on immediate responses to promises of a benefit.  (*Perez*, at p. 876; *Gonzalez*, at pp. 883–884.)  Longer gaps in time between the promise and the confession tend to indicate the former was not a motiving cause of the latter.  (See, e.g., *People v. Linton, supra*, 56 Cal.4th at pp. 1174, 1177 [implied promise made during morning interrogation not a motiving cause of appellant's late afternoon confession]; *People v. Carrington* (2009) 47 Cal.4th 145, 170–171 [no causation where improper conduct occurred one hour prior to appellant's confession].)

As discussed, the interval between the detective's improper conduct and defendant's incriminating admissions was approximately one hour and 45 minutes.  Even apart from the timing and sequence of events, there is no indication of causal effect.  Defendant seemed to completely forget about the detective's attempted inducement after being informed of Brogdon's death.  Defendant's claim must therefore be rejected.

Absence of Prejudice

Even if defendant could show causation, the claim would fail for lack of prejudice.  The erroneous admission of custodial statements is evaluated under the standard described in *Chapman v. California* (1967) 386 U.S. 18.  (*People v. Neal, supra*, 31 Cal.4th at p. 86.)  It is the People's burden to establish "beyond a reasonable doubt that the error ... did not contribute to the verdict obtained."  (*Chapman*, at p. 24.)  " 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as

revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*Neal*, at p. 86.)

The evidence of defendant's guilt was overwhelming without his custodial statements. Brogdon's phone records showed defendant called him multiple times shortly before the incident, with the last call being made just minutes prior to the shooting. Two eyewitnesses saw defendant arguing with Brogdon from behind a barbed wire fence even closer in time to Brogdon's death. One of those witnesses, Amezcua, saw defendant climb over the fence, which was independently corroborated by pieces of clothing containing defendant's DNA found on and around the fence.

The crime scene evidence and autopsy results indicate Brogdon was killed with a shotgun that was fired directly into the back door of his home. An eyewitness, Amezcua, saw defendant approaching Brogdon's house with a shotgun moments before Brogdon was killed. Within 30 minutes of the shooting, defendant was found in possession of a shotgun that contained his DNA and palm prints. Shotgun ammunition was found inside his car and at his residence. After the shooting, defendant was recorded on a jail call to Brogdon's wife admitting that he was the person who "pull[ed] the trigger."

Defendant argues certain statements made after the detective's improper conduct increased the likelihood of an implied malice finding. He primarily relies on his statements about developing feelings of hatred toward Brogdon after Brogdon allegedly threatened him with a handgun. The argument posits that evidence showing "he disliked Brogdon tended to make it more likely that he would be less concerned with his well-being and thus more likely to consciously disregard his well-being when he fired the shot through the back door of [Brogdon's] home." Defendant further contends that his admissions in the final stage of interrogation showed he previously lied about remembering the incident and thus "undermined the notion that he was not thinking clearly" when he fired into the door.

38.

The motives behind inherently dangerous behavior can be relevant to the issue of implied malice.  (See *Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 549.)  In this case, however, defendant's level of anger toward Brogdon at the time of the shooting was far more important than the reasons for his anger.  Repeatedly calling Brogdon in the middle of the night, showing up at his backyard with a shotgun, and scaling a barbed wire fence to physically confront him speaks volumes about defendant's mental state at the time.  The evidence was reinforced by Amezcua's testimony that defendant had said, "I'm going to kill this [guy].  I'm going to kill him."  Defendant also told detectives, prior to the lead detective's improper statements, that Brogdon had "jumped" him a month earlier.  During that admissible portion of the interrogation, when defendant was still claiming an inability to recall the incident, he cited "hatred" and wanting to "fight" Brogdon as reasons he might have gone over to his house.

As for the allegedly inadmissible statements "undermin[g] the notion that he was not thinking clearly," we have already explained that voluntary intoxication cannot negate implied malice.  (*Soto, supra*, 4 Cal.5th at p. 981; accord, *Parker, supra*, 113 Cal.App.5th at p. 1269.)  Accordingly, and pursuant to the foregoing analysis, any error in admitting the challenged statements was harmess.

## DISPOSITION

The judgment is affirmed.


HILL, P. J.

WE CONCUR:


FRANSON, J.


MEEHAN, J.

39.